IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,       :

    Plaintiff,             :
                                          Case No. 3:08cr173
    vs.                    :
                                     JUDGE WALTER HERBERT RICE

MARK RUTLEDGE,                  :

    Defendant.             :

DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION TO
SUPPRESS EVIDENCE AND STATEMENTS (DOC. #7)

Defendant Mark Rutledge ("Defendant" or "Rutledge") is charged in the Indictment (Doc. #3) with one count of possessing with intent to distribute at least 100 grams of heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B); and one count of distributing heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)©. Those charges are based on evidence seized by police officers on November 6, 2008. The Defendant has filed a motion, requesting that this Court suppress "all evidence seized from his person, vehicle [and/or] residence, including evidence seized pursuant to a search warrant issued on November 6, 2008, and any inculpatory statements the government attributes to [Defendant]." Doc. #7 at 1. This Court conducted a two-day, oral and evidentiary hearing on that motion, and

the parties have filed their post-hearing memoranda.  See Docs. ##15 and 16.[1]
The Court now rules on Defendant's Motion to Suppress Evidence and Statements (Doc. #7), beginning by setting forth its factual findings.

On November 6, 2008, David House ("House"), a narcotics detective employed by the City of Dayton Police Department ("DPD"), was on duty and parked in the area of Crocus Avenue in the City of Dayton.  According to House, he and other narcotics detectives employed by the DPD had arrested a number of people in that area for buying and selling narcotics via vehicle-to-vehicle transactions.[2]  On November 6th, House observed a blue Oldsmobile station wagon park along the curb on Crocus Avenue.  Based upon his experience as a narcotics detective, House believed that the occupants of the blue station wagon were waiting on Crocus Avenue to purchase drugs.  As a result, House parked his cruiser in the vicinity and continued to watch the vehicle.  After a few minutes, a white Buick SUV pulled up directly next to the driver's side of the station wagon.  House then observed what he believed to be a hand-to-hand drug transaction between the drivers of the two vehicles.  House followed the Buick SUV briefly, after which he turned the pursuit of that vehicle over to uniformed officers who lost contact with it as it fled through Downtown Dayton.

---

[1] Although the Court afforded Rutledge and the Government the option of filing reply memoranda, neither took advantage of that option.

[2] House testified that a vehicle-to-vehicle transaction occurs when both the buyer and the seller of narcotics would drive to a pre-arranged area in separate vehicles where the sale of narcotics would take place.  Typically, the seller would tell the purchaser where to park his vehicle.  The drug dealer would pull up next to the purchaser's vehicle and the transaction would occur through open windows.

While House was following the SUV, narcotics detectives Joey Myers ("Myers") and Detective Dennis Murphy ("Murphy") of the DPD followed the blue station wagon out of the area. With the assistance of a uniformed officer, they were able to stop that vehicle. After the uniformed officers had lost the SUV, House went to the location of the stop of the blue station wagon and spoke with its driver. The individual driving the blue station wagon ("informant") agreed to work with police officers and offered to call the individual who had been driving the Buick SUV, who was identified as PT, in order to set up another buy, so that officers could arrest him. After House indicated that he did not believe that PT would agree to be involved in another narcotics transaction, after he had been forced to flee from police, the informant stated that he knew other drug dealers, including one called Marco. The informant also gave House a telephone number at which Marco could be reached.

Before attempting to contact Marco, House called his supervisor, Sergeant Mark Spiers ("Spiers") of the DPD, informing the latter about his interaction with the cooperating individual and the opportunity to arrange a controlled buy of narcotics from Marco.[3] Spiers agreed to meet House, Myers and Murphy, along with some uniformed officers. During the meeting, House briefed the other officers. If a planned narcotics transaction occurred, they planned to allow Marco to drive away from the location of that transaction and to have uniformed officers in marked cruisers pull him over a few blocks away.

House then called Marco on the informant's cell phone at the number the latter had supplied. Placing the cell phone in speaker function, House handed it to

---

[3] Spiers was aware of the unsuccessful attempt to stop PT.

the informant. A male, who was identified as Marco, answered the phone.[4] In response to Marco's inquiry as to the purpose of the call, the informant indicated that he was looking for five of the good boy.[5] Marco indicated that he had it. The informant then told Marco that he was coming in to town and would be there in 15 to 20 minutes. In response, Marco told the informant to turn onto Philadelphia Drive from Salem Avenue and to call him when he (the informant) got there. After the conclusion of that telephone call between the informant and Marco, House informed the other officers of the location, to which the informant had been directed, and told them when to get into position in the area.

About 15 minutes later, House and the informant turned onto Philadelphia Drive from Salem Avenue. Again, House called Marco from the informant's cell phone, using the same number supplied by the informant, and handed the phone to the informant, after having put it in the speaker mode. Marco told the informant to continue to proceed on Philadelphia Drive, until he reached Garvin Road, where he should take a left and park in front of the first apartment building on the left. Informing the other officers of what the informant had been instructed to do, the informant and House drove to Garvin Road and parked in front of the first apartment building on the left, facing eastbound. When they arrived, House again dialed Marco's number on the informant's cell phone, placed the phone in speaker function and handed it to the informant, who told Marco, when he answered, "we're here." Marco's response was "okay."

---

[4] Upon hearing the male voice, the informant inquired "Marco?" The male voice responded yes.

[5] "Boy" is street slang for heroin.

After he and the informant had waited at that location for a number of minutes, with no one coming, House repeated his procedure for placing a call to Marco. Before the informant could say anything, Marco indicated that he was about 30 seconds away and that he would be right there.

They waited about three minutes longer, after which a large, silver Dodge Ram pickup truck drove past the location where House and the informant were parked in the blue station wagon. The pickup truck was driven a short distance beyond their position and turned around. It was then driven back to the blue station wagon and stopped next to the driver's door of that vehicle. The driver of the Dodge Ram pickup truck, later identified as Defendant, Rutledge, rolled down his window and handed the informant a plastic baggy containing five gel caps of heroin.[6] The informant gave those items to House, who, in turn, gave the informant three $20 bills, from the DPD buy fund, to pay Rutledge for the heroin.[7]

Upon receiving his money, Rutledge left the area, heading westbound on Garvin. Since there were a number of officers driving unmarked vehicles in the area, they were able to follow him as he drove along Garvin Road to the residence at 3745 Haney Road, where he drove his vehicle into the driveway. Murphy, along with Officer Tom Oney of the DPD, removed Rutledge from the Dodge Ram pickup.[8] When he was taken from that vehicle, two cell phones fell onto the ground from Rutledge's lap. One of those phones had the number that the

---

[6]Rutledge was accompanied by a passenger in the Dodge Ram pickup truck, Eugene Yates.

[7]House had previously recorded the serial numbers of that currency.

[8]Rutledge was removed from his vehicle at approximately 8:00 p.m., on November 6th.

informant had told House was Marco's. Rutledge was then placed on the ground, secured in handcuffs and arrested for trafficking in heroin. After the Defendant had been placed on the ground, officers discovered that he was holding in his hand the three $20 bills that House had given the informant to buy the heroin. Officers also searched Rutledge, recovering approximately $803 from his pockets and a set of keys clipped to one of his belt loops.[9] Prior to the Dodge Ram pickup being towed, Murphy searched it, seizing $148.

Spiers arrived at residence at 3745 Haney Road as the Defendant was being arrested and placed in handcuffs. For purposes of officer safety, he decided to make contact with individuals inside that house and to find out who was inside it. As a consequence, he immediately went to the front door while other officers went to the side door to cover it. When Spiers got no response to his knock on the front door, he left another officer there and went to the side door. About 30 seconds after he had knocked on the side door, it was answered by Victor Byrd ("Byrd"), a brother of both the Defendant and the owner of that house, Thomas Rutledge. Byrd, like the Defendant, resided in that house. Spiers introduced himself and explained that he and the other officers were there conducting a drug investigation involving the occupants of the Dodge Ram pickup truck parked in the driveway of the residence. Spiers asked Byrd if he knew who owned that vehicle. Byrd

---

[9]After Rutledge had been arrested and House had provided him <u>Miranda</u> warnings, the narcotics detective asked the Defendant about the heroin transaction that had occurred shortly before and what he had been doing on Garvin Road. Rutledge denied that he had been involved in a narcotics transaction, even though House pointed out that officers had taken from his hand the three $20 bills used to purchase the heroin. The Defendant also denied that he had been on Garvin Road. House did not question him further; nor is there evidence that any other officer questioned Rutledge.

indicated that it belonged to his brother, the Defendant. Byrd also stated that his brother had been living there for about a month. In addition, Byrd indicated that the only other person in the house was his 17-year old nephew, Dvonte Robinson ("Robinson"), who was then standing behind him in the kitchen. Spiers asked Byrd if he had a problem with his (Spiers) walking through the house, for the purpose of officer safety, just to make certain that no one else was inside. Transcript ("Tr.") at 60 Byrd indicated that he had no problem with that and escorted Spiers throughout the house. Id. at 60-61. At the time he entered that residence at 3745 Haney Road, Spiers did not have a search warrant authorizing such an entry; however, based upon Spiers' testimony, which the Court deems credible, it finds that Byrd consented to Spiers' conducting a sweep of the residence in order to satisfy himself that no one else was inside.[10] Byrd escorted Spiers throughout the house, during which the officer saw no one else therein. Spiers had been unable to search one bedroom, because it had a deadbolt lock on it. There is no indication that Byrd showed Spiers any area of the house over which he (Byrd) lacked common authority.

After they had returned to the kitchen, Byrd asked Spiers whether he wanted to contact the owner of the house, Thomas Rutledge, another of Byrd's brothers. While Byrd was attempting to contact Thomas Rutledge, Spiers obtained information from him and Robinson, i.e., their names, dates of birth and so forth.[11] As he was in the kitchen speaking with Byrd, Spiers noticed a large, plastic trash

---

[10]Below, the Court discusses its reasons for finding Spiers testimony in that regard to be credible.

[11]Byrd was not able to contact his brother Thomas Rutledge.

can with an open top.  Glancing down at the trash can, Spiers noticed therein a large amount of plastic gloves and several plastic bags with residue that appeared to Spiers to be consistent with powdered heroin.  Subsequently, Spiers told House about what he had seen in the trash can, causing the latter to enter the residence at 3745 Haney Road and to seize some of the plastic bags and gloves.  House field tested the residue thereon.  That test indicated that the residue was heroin.  House also field tested the gel caps that Rutledge had sold him and discovered that they likewise contained heroin.

Using the information gathered that day concerning Rutledge's distribution of heroin, including the gloves and plastic bags which Spiers had seen during his sweep of the residence of 3745 Haney Road and the results of House's field tests of those items, House executed an affidavit, with which he was able to obtain a search warrant for that residence from Judge Cynthia Heck of the Vandalia Municipal Court.  When that warrant was executed, officers discovered that the key they had taken from the Defendant opened the deadbolt lock on one of the bedrooms in that residence.  Inside that residence, officers discovered, <u>inter alia</u>, heroin, marijuana, $8,512 in currency and a digital scale.

As is indicated above, the Defendant has requested in his motion that this Court suppress "all evidence seized from his person, vehicle [and/or] residence, including evidence seized pursuant to a search warrant issued on November 6, 2008, and any inculpatory statements the government attributes to [Defendant]." Doc. #7 at 1.  In his post-hearing memorandum, however, Rutledge merely argues that the Court should suppress the evidence that was seized from his residence at

3745 Haney Road. Since the Defendant has not argued that the Court should suppress his statements and the evidence seized from him and his automobile, the Court concludes that he has waived his motion seeking suppression as it pertains to such evidence and overrules his Motion to Suppress Evidence and Statements (Doc. #7), as it relates to same. Consequently, it is not necessary to address the Government's arguments in its post-hearing memorandum that the search of the Defendant and his vehicle did not violate the Fourth Amendment. <u>See</u> Doc. #15 at 2-5. The Court now turns to the issue which the Defendant has argued strenuously in his post-hearing memorandum, to wit: his request to suppress the evidence seized from his residence. In particular, the parties focus on whether Spiers' warrantless entry into and sweep of the residence at 3745 Haney Road violated Defendant's rights under the Fourth Amendment. The Government argues that Spiers' entry into that residence did not constitute such a violation, given that Byrd consented to his conducting a sweep of that residence to make certain that no one else was inside. Alternatively, the Government asserts that, even in the absence of consent, Spiers' initial sweep of the house was lawful pursuant to <u>Maryland v. Buie</u>, 494 U.S. 325 (1990).[12] In addition to taking the opposite point of view on those issues, the Defendant contends that the independent source rule

---

[12]In <u>Buie</u>, the Supreme Court held that officers may conduct a protective sweep of a residence, defined as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others" (494 U.S. at 327), when a suspect was arrested outside the residence, if:
> the searching officer possesse[d] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted] the officer in believing that the area swept harbored an individual posing a danger to the officer or others.

<u>Id</u>. (internal quotation marks and citations omitted; brackets in the original).

does not apply herein.[13] For reasons which follow, this Court concludes that Byrd consented to Spiers' initial sweep of that residence. Therefore, it is unnecessary to address the question of whether that sweep violated the rule established by the Supreme Court in Buie and, if so, whether the independent source rule could be applied to save the lawfulness of the subsequent search conducted when the search warrant was executed. Moreover, since the Defendant has not argued that House's affidavit failed to establish probable cause to search the residence at which Rutledge was residing, this Court need not address that issue. However, given that House's affidavit established that Rutledge had sold five gel caps containing heroin and then returned immediately to his residence, wherein officers had discovered plastic bags and gloves with heroin residue on them, such an argument would not have been persuasive. This Court begins by reviewing the legal standards which must be applied whenever the Government argues that a warrantless search is lawful as a result of consent.[14]

---

[13]If the independent source rule were applicable, this Court would have to decide whether House's affidavit established probable cause to search the residence at 3745 Haney Road, even if the information derived from Spiers' initial sweep was disregarded. See United States v. Jenkins, 396 F.3d 751 (6th Cir.) (discussing the independent source rule), cert. denied, 546 U.S. 813 (2005).

[14]Although the Defendant has not argued that Byrd lacked the authority to consent to the search of 3745 Haney Road, this Court will briefly set forth why such an argument would have been unavailing. In United States v. Waller, 426 F.3d 838 (6th Cir. 2005), the Sixth Circuit discussed the authority of a resident of a dwelling to consent to its search:

> [In United States v. Matlock, 415 U.S. 164, 171-72 (1974), the Supreme Court held that when the government seeks to justify a warrantless search by proof of voluntary consent, in the absence of proof that consent was given by the defendant, it "may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." In describing what constitutes common authority, the Supreme Court explained that "[common authority is, of course, not to be implied from the mere

In <u>United States v. Hudson</u>, 405 F.3d 425 (6th Cir. 2005), the Sixth Circuit reiterated that:

> "Consent must be … unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion." <u>United States v. Butler</u>, 223 F.3d 368, 375 (6th Cir. 2000) (quoting <u>United States v. Williams</u>, 754 F.2d 672, 674-75 (6th Cir. 1985)); <u>see</u> <u>also</u> <u>United States v. Ivy</u>, 165 F.3d 397, 401 (6th Cir. 1998).

<u>Id</u>. at 443. The Sixth Circuit has repeatedly held that the Government has the burden of proving consent by the preponderance of the evidence. United States v. Canipe, 569 F.3d 597, 602 (6th Cir. 2009); <u>United States v. Henry</u>, 429 F.3d 603, 616 n. 16 (6th Cir. 2005); <u>United States v. Haynes</u>, 301 F.3d 669, 679 (6th Cir. 2002); <u>United States v. Riascos-Suarez</u>, 73 F.3d 616, 625 (6th Cir. 1996). Whether the Government has met its burden in that regard "is a question of fact to be determined from the totality of all the circumstances." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 227 (1973).

Herein, the Defendant does not argue that Byrd gave permission to Spiers to search the residence at 3745 Haney Road as a result of duress and coercion, rather than such permission having been unequivocally and intelligently given. Instead, Defendant contends that Byrd did not consent to Spiers initial sweep of that

---

> property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property[.]" <u>Id</u>. at 171, n. 7. Rather, the Court said, common authority rests "on <u>mutual use</u> of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." <u>Id</u>. (emphasis added).

Id at 845. Herein, Byrd resided in that house and did not show Spiers any area over which he (Byrd) lacked common authority. For instance, Byrd did not show Spiers the bedroom which was locked with the deadbolt. Accordingly, Byrd had authority to consent to the search of that residence by Spiers.

residence, because the officer merely told him that he needed to check the house for other individuals. Doc. #16 at 11. According to Defendant, Byrd, at most, acceded to Spiers' demand that he (Byrd) permit the officer to search the residence for other individuals who may be inside. Id. Defendant bases this argument on Byrd's testimony, which he asserts contradicts that offered by Spiers. Above, this Court has credited Spiers testimony and found that Byrd consented to have the police officer conduct a sweep of the residence in order to assure himself that no one, other than Byrd and his nephew, Robinson, was located therein. The Court begins its explanation of why it has credited Spiers testimony concerning entry into the house, by reviewing Byrd's testimony on that subject.

Byrd testified that he saw a number of police cars with their overhead lights flashing outside of the house at 3745 Haney Road. As he walked out the side door of that house, in order to explore what was going on, Spiers was coming up to that door. According to Byrd, Spiers told him to go back into the house and indicated that he needed to check the house to make certain that no else was inside.[15] After Byrd had told Spiers that no one other than his nephew and himself were in the residence, the officer said that he wanted to check the house. In response to Spiers' statement, Byrd showed him throughout the house, thus demonstrating to the officer that no one else was inside it.

As can be seen, Byrd's testimony is not necessarily inconsistent with that given by Spiers, who testified that he asked Byrd if he had a problem with his (Spiers) walking through the house in order to make certain that no one else was there, for the officers' safety, and that Byrd had said that he had no problem with

---

[15]Byrd testified that Spiers was talking to someone over a radio about a stolen car, when he and the officer first came into contact.

that. Notably missing from Byrd's testimony is any indication that he told Spiers that he could not walk through the house and the officer, ignoring his statement, barged in; or that Spiers merely stated that he wanted to walk through the house, without attempting to secure Byrd's consent. Moreover, both Spiers and Byrd agree that the latter escorted the former though the house, showing him its rooms. A citizen who has just rejected a police officer's request to look through his (the citizen's) residence would hardly be expected to show the house to the officer who has ignored the denial of the officer's request. In addition, this Court finds that the testimony from Byrd's nephew, Robinson, supported that given by Spiers. Robinson testified that, after his uncle had told an officer that no one else was in the house, the officer asked Byrd if he (the officer) could look around that house. According to Robinson, Byrd said "yeah, sure." Tr. at 125.

Based upon the foregoing, this Court has credited Spiers' testimony and, based upon same, finds Byrd consented to Spiers' initial sweep of the residence at 3745 Haney Road. Accordingly, the Court overrules the Defendant's Motion to Suppress Evidence and Statements (Doc. #7).

August 6, 2009

>   /s/ Walter Herbert Rice
>   WALTER HERBERT RICE, JUDGE
>   UNITED STATES DISTRICT COURT

Copies to:

Counsel of Record.